488 S.E.2d 20

SHAWNEE BANK, INC., a West Virginia Banking Corporation, Successor by Merger to 2nd Avenue Bank of South Charleston, Appellant Below, Appellant

v.

James H. PAIGE, III, Secretary of the Department of Tax and Revenue of the State of West Virginia Appellee Below, Appellee

No. 23816.

Supreme Court of Appeals of West Virginia.

Submitted April 29, 1997.

Decided May 29, 1997.

William W. Booker, Kay, Casto, Chaney, Love & Wise, Charleston, for Appellant.

Stephen Stockton, Assistant Attorney General, Charleston, for Appellee.

DAVIS, Justice:

Shawnee Bank, Inc., successor by merger to 2nd Avenue Bank of South Charleston, appeals an order of the Circuit Court of Kanawha County, which affirmed a decision of the Commissioner of the State of West Virginia Department of Tax and Revenue. Shawnee Bank contends that the circuit court erred in finding that the decision of the Tax Commissioner was not plainly wrong to the extent that such decision found that, for purposes of the state Business and Occupation tax, (1) interest received by a bank on certain securities of the Federal National Mortgage Association is taxable as gross income to the bank, and (2) a bank's bad debt

deduction is limited to the accrued interest on such debt for which Business and Occupation tax has been paid. We find that the circuit court correctly ruled that the decision of the Department of Tax and Revenue was not plainly wrong.

## I.

### FACTUAL AND PROCEDURAL HISTORY

On June 8, 1988, the State Tax Department of West Virginia [hereinafter Tax Department] issued an assessment for Business and Occupation tax [hereinafter B & O tax][1] against 2nd Avenue Bank of South Charleston [hereinafter the bank][2] for the period of January 1, 1982, through June 30, 1987, for a tax liability of $4,231.11, plus interest of $1,265.50. The tax liability resulted from the auditor's disallowance of certain exclusions and deductions from gross income that were claimed by the bank. Specifically, the auditor disallowed the bank's exclusion of interest earned from investments in securities issued by the Federal National Mortgage Association [hereinafter FNMA]. The auditor also disallowed the bank's deduction of the principal of bad debt reserves.

The bank responded to the assessment by filing a petition for reassessment with the Tax Department. After a hearing on the petition, the Tax Commissioner[3] rendered an administrative decision affirming the assessment. The bank then appealed to the Circuit Court of Kanawha County where, by order entered May 1, 1996, the court affirmed the decision of the Tax Commissioner. It is from this final order of the circuit court that the bank now appeals.

1. "The West Virginia business and occupation tax is a tax on the privilege of doing business in West Virginia; it is not an income tax." *H.O. Anderson, Inc. v. Rose*, 177 W.Va. 419, 425, 352 S.E.2d 541, 547 (1986) (citing Syl. pt. 3, *Bethlehem Mines Corp. v. Haden*, 153 W.Va. 721, 172 S.E.2d 126 (1969)). Banks became subject to the West Virginia B & O tax in 1971, with the adoption of W. Va.Code § 11-13-2k. Acts of the Legislature, Regular Session, ch. 169. However, this section of the West Virginia Code was rendered inoperative as of July 1, 1987, by W. Va. Code § 11-13-28 (1987) (Repl.Vol.1995), and was subsequently repealed. 1989 Acts of the Legislature, First Extraordinary Session, ch. 2.

## II.

### STANDARD OF REVIEW

In this case we are asked to review certain statutory and regulatory provisions of the West Virginia B & O tax to determine whether the Tax Commissioner correctly interpreted such provisions. We have previously held that "[i]nterpreting a statute or an administrative rule or regulation presents a purely legal question subject to *de novo* review." Syl. pt. 1, *Appalachian Power Co. v. State Tax Dep't of West Virginia*, 195 W.Va. 573, 466 S.E.2d 424 (1995). Furthermore, "[o]nce a full record is developed, both the circuit court and this Court will review the findings and conclusions of the Tax Commissioner under a clearly erroneous and abuse of discretion standard unless the incorrect legal standard was applied." Syl. pt. 5, *Frymier-Halloran v. Paige*, 193 W.Va. 687, 458 S.E.2d 780 (1995). In making our determination, we are mindful that "[i]nterpretations of statutes by bodies charged with their administration are given great weight unless clearly erroneous." Syl. pt. 4, *Security Nat'l Bank & Trust Co. v. First W. Va. Bancorp., Inc.*, 166 W.Va. 775, 277 S.E.2d 613 (1981).

## III.

### DISCUSSION

*A.*

*Appropriateness of Exclusion of Interest Income Received from Federal National Mortgage Association*

We are first asked to interpret the language of W. Va.Code § 11-13-2k (1983)

2. The appellant, Shawnee Bank, Inc., became successor by merger to 2nd Avenue Bank of South Charleston. Thus, the term "the bank" will hereinafter be used to refer to either 2nd Avenue Bank of South Charleston or Shawnee Bank.

3. During the proceedings before the circuit court, James H. Paige, III, was the Secretary of the Department of Tax and Revenue of the State of West Virginia/Tax Commissioner. On February 11, 1997, Robin C. Capehart succeeded James Paige in this office. Accordingly, Commissioner Capehart, not former Commissioner Paige, responded to this appeal.

(Repl.Vol.1983) (Repealed 1989),[4] to determine whether, for the purpose of calculating a bank's B & O tax liability, interest income received from the Federal National Mortgage Association [hereinafter FNMA] is excludable from gross income as "interest received on the obligations of the United States, its agencies and instrumentalities." The relevant portion of W. Va.Code § 11–13–2k states:

Upon every person engaging or continuing within this State in the business of banking or financial business, from and after the first day of April, one thousand nine hundred seventy-one, the tax shall be equal to one and fifteen one-hundredths percent of the gross income received from interest, premiums, discounts, dividends, service fees or charges, commissions, fines, rents from real or tangible personal property, however denominated, royalties, charges for bookkeeping or data processing, receipts from check sales, charges or fees, and receipts from the sale of tangible personal property: *Provided, that gross income shall not include (a) interest received on the obligations of the United States, its agencies and instrumentalities*

. . . .

(Emphasis added).

The bank argues that the FNMA is an agency or instrumentality of the United States as contemplated by W. Va.Code § 11–13–2k (1983) (Repl.Vol.1983) (Repealed 1989). Thus, interest income earned by the bank on FNMA investments may be excluded from the bank's gross income when calculating its B & O tax liability. Finally, the bank contends that even if a state may assess a tax on the interest income earned on FNMA investments without violating the intergovernmental tax immunity doctrine,[5] such tax is prohibited by W. Va.Code § 11–13–2k.

The Tax Commissioner responds that *Rockford Life Insurance Company v. Illinois Department of Revenue*, 482 U.S. 182, 107 S.Ct. 2312, 96 L.Ed.2d 152 (1987), is instructive to the determination of this issue. In *Rockford*, the United States Supreme Court held that inclusion in a tax base of the value of mortgage-backed securities guaranteed by the Government National Mortgage Association [hereinafter GNMA] did not violate a federal tax immunity statute [6] or the doctrine of intergovernmental tax immunity. In reaching this conclusion, the Supreme Court explained that GNMA securities are not "a binding promise by the United States to pay specified sums at specified dates." *Id.* at 189–90, 107 S.Ct. at 2316–17, 96 L.Ed.2d at 160. The Tax Commissioner interprets this comment to mean that the GNMA is not an instrumentality of the United States, and furthermore, because of the similarity between the FNMA and the GNMA, the FNMA likewise is not an instrumentality of the United States. In support of this argument, the Tax Commissioner cites *Yurista v. Commissioner of Revenue*, 460 N.W.2d 24 (Minn.1990), in which the Supreme Court of Minnesota held that interest income from securities issued by the FNMA are not exempt from Minnesota's state income tax. The *Yurista* court addressed a statute that exempted from state income tax "interest income on obligations of any authority, commission, or instrumentality of the United States to the extent includable in taxable income for federal income tax purposes *but exempt from state income tax under the laws of the United States*." *Id.* at 27 (emphasis added).

■ We believe the authorities cited by the Tax Commissioner establish that a state may tax interest income from securities is-

---

4. While the 1983 version of W. Va.Code § 11–13–2k was not in effect during the first year covered by the assessment in question, the 1983 amendment made no change to the language we are now asked to interpret.

5. The United States Supreme Court has explained that:

[the intergovernmental tax immunity doctrine] is based on the proposition that the borrowing power is an essential aspect of the Federal Government's authority and, just as the Su-

premacy Clause bars the States from directly taxing federal property, it also bars the States from taxing federal obligations in a manner which has an adverse effect on the United States' borrowing ability.

*Rockford Life Ins. Co. v. Illinois Dep't of Revenue*, 482 U.S. 182, 190, 107 S.Ct. 2312, 2317, 96 L.Ed.2d 152, 160 (1987) (citations omitted).

6. 31 U.S.C. § 3124(a).

sued by the FNMA without violating the intergovernmental tax immunity doctrine. However, this does not resolve the question of whether such income is in fact subject to taxation under West Virginia law. To answer that question we must determine whether the FNMA is an agency or instrumentality of the United States as contemplated by W. Va.Code § 11–13–2k (1983) (Repl. Vol.1983) (Repealed 1989).

Prior to 1968, the FNMA was a government agency within the Department of Housing and Urban Development. 12 U.S.C. § 1717(a)(1) (1992) (1994 Ed.). However, on September 1, 1968, the FNMA was partitioned into two separate and distinct corporations, the FNMA and the GNMA. 12 U.S.C. § 1717(a)(2) (1992) (1994 Ed.). The post-partition FNMA became a "[g]overnment-sponsored private corporation,"[7] while the GNMA remained a part of the federal government. 12 U.S.C. § 1716b (1968) (1994 Ed.).

Several courts have addressed the question of whether the post-partition FNMA is a government agency or instrumentality. These courts have reached different results in different contexts. As the bank noted in its brief, the United States Court of Appeals for the Ninth Circuit examined this issue in answering the question of whether the City of Los Angeles violated the Supremacy Clause by foreclosing on property in which the FNMA had an interest. *Rust v. Johnson*, 597 F.2d 174 (9th Cir.1979). To determine whether the city had exercised its power over property of the United States, the court had to determine whether the FNMA was a federal instrumentality. *Id.* at 177. The *Rust* court opined that the partitioning of the FNMA resulted from the "Congressional intent to reduce the impact of [the] FNMA's operations on the budget of the

United States." *Id.* (citations omitted). In addition, the court observed that the status of the post-partition FNMA was analogous to the federal land banks and federal home loan banks, which, the court remarked, "are treated as federal instrumentalities engaged in the performance of governmental functions." *Id.* at 178. Finally, the *Rust* court expressed that it was "unable to find anything in the legislative history or in the statutes governing the operation of FNMA which supports the conclusion that Congress intended to strip FNMA of its status as a federal instrumentality." *Id.*

Similarly, the United States District Court for the Southern District of New York, also addressing a Supremacy Clause claim, determined that the FNMA was an instrumentality of the United States. *Federal Nat'l Mortgage Ass'n v. Lefkowitz*, 390 F.Supp. 1364 (S.D.N.Y.1975).[8] In reaching this conclusion, the *Lefkowitz* court considered the extent of the regulatory power over the post-partition FNMA that was retained by the Secretary of Housing and Urban Development and the Secretary of the Treasury. *Id.* at 1368. The court further considered the fact that Congress does not require the FNMA to qualify to do business in any state and provided it with immunity from most forms of state taxation. *Id.*[9]

Conversely, the United States Court of Appeals for the Sixth Circuit, addressing, in part, the issue of whether the FNMA is an instrumentality of the federal government such that its foreclosure of a mortgage by advertisement constituted state action that was subject to the due process requirements of the Fifth Amendment to the United States Constitution, concluded that the FNMA was not an instrumentality of the United States. *Northrip v. Federal Nat'l Mortgage Ass'n.*, 527 F.2d 23 (6th Cir.1975). In its discussion

---

**7.** The purpose of the FNMA is to operate a secondary market for home mortgages. 12 U.S.C. § 1716b (1968) (1994 Ed.).

**8.** Although the *Lefkowitz* court found that the FNMA was a federal instrumentality, it concluded that the burden created by the New York state requirement that the FNMA pay interest on tax and insurance escrow accounts was collateral and minimal and did not violate the Supremacy

Clause. *Federal Nat'l Mortgage Ass'n v. Lefkowitz*, 390 F.Supp. 1364 (S.D.N.Y.1975).

**9.** For another case implying that the FNMA is a federal instrumentality, see *Kidder Peabody & Co., Inc. v. Unigestion Int'l, Ltd.*, 903 F.Supp. 479 (S.D.N.Y.1995) (finding, in part, that FNMA securities were government securities and, as such, they were exempt from federal Securities Act registration requirements).

of this issue, the *Northrip* court explained that President Johnson believed that "the secondary [mortgage] market operations were more appropriately placed in the private sector." *Id.* at 30 (citing President's Message, *Houses and Cities.* H.R. Doc. No. 261, 90th Cong., 2nd Sess. (1968)). Consequently, the President proposed legislation to privatize the FNMA, which Congress then passed. *Id.*

Continuing its analysis, the *Northrip* court acknowledged the broad regulatory powers over the FNMA granted to the Secretary of Housing and Urban Development and the additional limited control granted to the Secretary of the Treasury. *Id.* at 30–31. The court also recognized that the government had retained some involvement in the workings of the FNMA in the form of appointing a portion of the board of directors. *Id.* at 31–32. However, the court also observed that the profits of the private FNMA corporation were "taxed at the regular corporate rates," and employees hired after 1968 were "employees of the corporation and [were] not subject to the civil service laws." *Id.* at 30–31 (citing 12 U.S.C. § 1723a(d)(1)). Finally, in reaching its conclusion that actions of the FNMA were not state actions, the court commented:

> The statutes regulating FNMA imposed on it certain obligations but there is no indication that FNMA's activities necessarily should be considered powers traditionally associated with sovereignty, such as eminent domain.
>
> It was the congressional intent to disassociate FNMA from its previous government ownership because it was not appropriate for the government to be involved in the operation of a secondary mortgage market.

*Id.* at 32.[10]

The *Northrip* rationale was subsequently followed by the United States Court of Appeals for the Fifth Circuit. *Roberts v. Cameron–Brown Co.,* 556 F.2d 356 (5th Cir.1977). In *Roberts,* the court addressed a due process issue related to the FNMA's nonjudicial foreclosure of a mortgage. The court cited *Northrip,* and stated: "[w]e stand with the Sixth Circuit position that although the regulating statutes impose certain obligations on FNMA, the federal government and FNMA have not become so interdependent as to make its actions the actions of the federal government." *Id.* at 359.

The Supreme Court of Missouri has also found the *Northrip* rationale persuasive. In *Federal National Mortgage Association v. Scott,* 548 S.W.2d 545 (Mo.1977), the court was asked to determine whether the FNMA's foreclosure on a deed of trust was federal action subject to the due process clause of the Fifth Amendment. The court adopted the reasoning of the Sixth Circuit as expressed in *Northrip* and held that the FNMA was not a federal instrumentality and that its action was the action of a private individual. *Id.* at 549.

It has also been determined that the FNMA is not a federal agency in a context other than due process. In *Werts v. Federal National Mortgage Association,* 48 B.R. 980 (E.D.Pa.1985), a bankruptcy action appealed to the United States District Court for the Eastern District of Pennsylvania, the court determined that the FNMA was not an agency of the United States. The plaintiff-debtor in *Werts* complained, in part, that the FNMA failed to comply with the disclosure requirements of the Truth in Lending Act, and consequently, the debtor was entitled to certain statutory remedies. The FNMA argued in defense that it was not subject to civil or criminal penalties for violating the Truth in Lending Act pursuant to 15 U.S.C. § 1612(b)[11] because it was an agency of the

---

**10.** Although the *Northrip* court recognized the contrary result reached in *Federal Nat'l Mortgage Ass'n v. Lefkowitz,* 390 F.Supp. 1364 (S.D.N.Y. 1975), it commented that the *Lefkowitz* court "discussed neither state action cases nor cases construing the Supremacy Clause as they related to federally organized corporations." *Northrip v. Federal National Mortgage Assoc.,* 527 F.2d 23, 32 n. 7 (6th Cir.1975). The *Northrip* court concluded that *Lefkowitz* was not persuasive in resolving a case involving state action under the Fifth or Fourteenth Amendments to the United States Constitution. *Id.*

**11.** This provision states in relevant part: " '[n]o civil or criminal penalty provided under [the Truth in Lending Act] for any violation thereof may be imposed upon the United States or any

United States. The district court cited, with approval, *Northrip v. FNMA* and concluded that the FNMA was not an agency of the United States. *Werts* at 983.

■ Based upon the foregoing, it is apparent that the FNMA is a hybrid organization that is considered an instrumentality of the United States under some circumstances, such as those implicating the Supremacy Clause, while in other contexts, such as due process, it is considered a non-governmental private entity. We have previously held that " ' "[w]here a person claims an exemption from a law imposing a license or tax, such law is strictly construed against the person claiming the exemption." Syl. pt. 2, *State ex rel. Lambert v. Carman, State Tax Commissioner,* 145 W.Va. 635, 116 S.E.2d 265 (1960).' Syl. pt. 5, *Pennsylvania & West Virginia Supply Corp. v. Rose,* 179 W.Va. 317, 368 S.E.2d 101 (1988)." Syl. pt. 2, *Tony P. Sellitti Constr. Co. v. Caryl,* 185 W.Va. 584, 408 S.E.2d 336 (1991). Because the FNMA is not an instrumentality of the United States in the strict sense of the term, and because we must construe W. Va.Code § 11–13–2k strictly against the bank, we hold that the FNMA is not an instrumentality of the United States as contemplated by that statute. Consequently, we hold further that all interest received by a bank on securities of the FNMA, except interest derived from mortgage-backed securities,[12] is taxable as gross income to the bank pursuant to W. Va.Code § 11–13–2k (1983) (Repl.Vol.1983) (Repealed 1989).

### B.

### Bad Debt Deduction

We next are asked to determine the extent to which a bank's bad debts may be deducted from gross income. The Tax Commissioner concluded that a bank's bad debt deduction is limited to the accrued interest on such debt for which business and occupation tax has been paid. Nevertheless, the bank argues that it properly deducted its net business bad debts in calculating its taxable income for B & O tax purposes.[13] The bank argues that its deductions conformed with the language of the 1964 B & O tax regulations, which stated in relevant part:

> Those reporting on an accrual basis *may,* except as hereinafter provided, *deduct* bad debts from gross receipts for the year in which the debts are ascertained to be worthless and · are charged off. The amount to be deducted is net bad debts. Net bad debts are charge offs minus recoveries.

W. Va. Leg. Reg. (BOT) 11–13, Series I, § 4.02(a), page 13 (1964).

The bank submits that, although the Tax Commissioner argues that this regulation was repealed in 1974, the commissioner provides no statutory or regulatory support for that contention. Moreover, the bank argues that even if the 1964 regulation does not apply to the present case, the definition of "gross income" found in W. Va.Code § 11–13–2k (1983) (Repl.Vol.1983) (Repealed 1989) supports the bank's argument that it is entitled to the deduction as claimed.

By contrast, the Tax Commissioner responds that neither W. Va.Code § 11–13–2k nor the applicable legislative regulations provide for the deduction of bad debt principal as claimed by the bank. The Tax Commissioner argues that the 1964 version of the regulations was superseded by replacement regulations in 1974. The Tax Commissioner further argues that the 1974 replacement regulations do not contain the provision relied on by the bank. In addition, the Tax Commissioner submits that " '[t]he Legisla-

agency thereof....' " *Werts v. Federal Nat'l Mortgage Ass'n,* 48 B.R. 980, 983 (E.D.Pa.1985) (alteration in original) (quoting 15 U.S.C. § 1612(b)).

12. Our holding makes an exception for interest derived from mortgage-backed securities to conform with the provision of W. Va.Code § 11–13–2k (1983) (Repl.Vol.1983) (Repealed 1989) that states "gross income shall not include ... (c) interest received on investments or loans primar-

ily secured by first mortgages or deeds of trust on residential property occupied by nontransients...."

13. The bank asserts that it took the deduction in the year the loans were ascertained to be worthless in an amount sufficient to offset the previously reported and taxed income, but not exceeding the principal loaned.

ture must be presumed to know the language employed in former acts, and, if in a subsequent statute on the same subject it uses different language in the same connection, the court must presume that a change in the law was intended.' Syl. pt. 2, *Hall v. Baylous,* 109 W.Va. 1, 153 S.E. 293 (1930)." Syl. pt. 2, *Butler v. Rutledge,* 174 W.Va. 752, 329 S.E.2d 118 (1985).

We need not resort to the rules of interpretation to determine whether the 1964 regulations are applicable to the case *sub judice.* The foreword to the 1974 B & O Tax Regulations states: "[t]he business and occupation tax rules and regulations contained herein supersede those business and occupation tax regulations that were promulgated by the Tax Department in 1964." W. Va. B & O Tax Reg. (CCH) ¶ 76–501, foreword (1974).[14] Because the provision relied upon by the bank was omitted from the 1974 B & O Tax Regulations, we find that the bank's reliance on that particular provision was misplaced. Consequently, we look to the statutes and regulations in effect during the relevant period, 1982 to 1987, to determine if and to what extent a bank's bad debts may be deducted from its gross income.

 A bank's B & O tax liability is calculated as a percentage of the bank's "gross income." W. Va.Code § 11–13–2k (1983) (Repl.Vol.1983) (Repealed 1989). In the absence of an express B & O tax bad debt deduction, we believe that such a deduction may be claimed only to the extent that moneys received were initially reported and taxed as gross income but were later determined not to be gross income. *Cf. Soriano v. Soriano,* 184 W.Va. 302, 307, 400 S.E.2d 546, 551 (1990) (observing that "the United States Supreme Court has stated: 'The propriety of a deduction does not turn upon general equitable considerations, such as a demonstration of effective economic and practical equivalence. Rather, it "depends upon legislative grace; and only as there is clear provision therefor can any particular deduction be allowed." ' *Commissioner v. National Alfalfa Dehydrating & Milling Co.,* 417 U.S. 134,

148–49, 94 S.Ct. 2129, 2137, 40 L.Ed.2d 717, 727 (1974) (quoting *New Colonial Ice Co. v. Helvering,* 292 U.S. 435, 440, 54 S.Ct. 788, 790, 78 L.Ed. 1348, 1352 (1934))"); *Christopher v. James,* 122 W.Va. 665, 667, 12 S.E.2d 813, 814 (1940) (recognizing, in income tax context, general rule that " '[e]very deduction from gross income is allowed as a matter of legislative grace, and "only as there is a clear provision therefor can any particular deduction be allowed...." ' *White v. United States,* 305 U.S. 281, 292, 59 S.Ct. 179, 184, 83 L.Ed. 172, [179 (1938) ]"), *overruled in part, In re Kanawha Valley Bank,* 144 W.Va. 346, 109 S.E.2d 649 (1959). Thus, we must examine the meaning of gross income as contemplated for B & O tax purposes:

> The term "gross income" of a banking or financial business shall mean interest, premiums, discounts, dividends, service fees or charges, commissions, fines, rents from real or tangible personal property, royalties, charges for bookkeeping or data processing, receipts from check sales, charges or fees, and receipts from the sale of tangible personal property.

W. Va. Leg. Reg. (BOT) 11–10, Series XIII, § 2k.02, page 155 (1974). *See also* W. Va. Code § 11–13–2k (1983) (Repl.Vol.1983) (Repealed 1989). "In the interpretation of statutory provisions the familiar maxim *expressio unius est exclusio alterius,* the express mention of one thing implies the exclusion of another, applies." Syl. pt. 3, *Manchin v. Dunfee,* 174 W.Va. 532, 327 S.E.2d 710 (1984). Applying this maxim, we conclude that the legislature did not intend to include the return of the principal of a loan in the calculation of gross income. We therefore hold that a bank's B & O Tax bad debt deduction is limited to the accrued interest on such debt for which business and occupation tax has been paid. Consequently, we find that the Tax Commissioner did not abuse his discretion. Therefore, his conclusion was not clearly erroneous.

## IV.

### CONCLUSION

For the foregoing reasons, we conclude that the circuit court did not err in upholding

---

14. Pursuant to W. Va.Code § 29A–2–5 (1982) (Repl.Vol.1993), the 1974 regulations were re-filed with the Secretary of State on December 29,

1982 (however the effective date remained July 1, 1974). W. Va. Leg. Reg. (BOT) 11–10, Series XIII, § 1.05, page 1 (1974) (re-filed 1982).

the decision of the Tax Commissioner as not plainly wrong to the extent that the commissioner found, for purposes of the State B & O Tax, that (1) the FNMA was not an instrumentality of the United States as contemplated by W. Va.Code § 11–13–2k (1983) (Repl. Vol.1983) (Repealed 1989), and thus, interest received by a bank on certain securities of the FNMA was taxable as gross income to the bank, and (2) a bank's bad debt deduction is limited to the accrued interest on such debt for which business and occupation tax has already been paid. Consequently, the May 1, 1996, order of the Circuit Court of Kanawha County is affirmed.

Affirmed.